## 75783. ADAMS v. THE STATE.
### (370 SE2d 197)

BIRDSONG, Chief Judge.

Victor Howard Adams was tried and convicted of aggravated assault with intent to rob, in the attempted robbery of a liquor store. On appeal he contends the evidence was insufficient to convict him as a matter of law, as in *Moore v. State*, 255 Ga. 519 (340 SE2d 888); *Brown v. State*, 250 Ga. 862 (302 SE2d 347), there being no evidence that he participated in the robbery or even knew of it. He contends the only evidence of guilt is circumstantial, in that after the robber, Stroupe, who had been shot, stumbled back to Stroupe's (stolen) car 200 yards away, the appellant who was in the car got Stroupe out of the ditch where he had fallen, put him in the car, and drove the car away, i.e. (according to the prosecution's view), fled. *Held*:

1. The appellant in effect contends the evidence does not exclude his own reasonable hypothesis, which is that he was not fleeing but was attempting to get help for his companion Stroupe, who appellant did not know had attempted armed robbery.

Viewing the evidence in favor of the verdict, as we are required to do on appeal (see *Johnson v. State*, 231 Ga. 138 (1) (200 SE2d 734); *Fulford v. State*, 144 Ga. App. 546 (1) (241 SE2d 646)), we find the evidence authorized the following findings: Appellant Victor Adams lived at Tybee Island beach with his girl friend and his 17-year-old nephew. Appellant was to start temporary work in a few days as a shrimper. On June 2, 1986, at about 4:00 a.m., appellant's friend Herbert Stroupe showed up at appellant's house on the beach, having driven there with two companions accompanying him in another car. The black Camaro Stroupe arrived in was stolen, but appellant testified he did not know it and there is no evidence that he did. Stroupe's two companions went to sleep in the house. Appellant walked his girl friend to her job; then appellant, his nephew and Stroupe went out to the beach. They began drinking at 7:00 a.m. or 9:00 a.m., on the beach. Throughout the day appellant and friends drank beer, toured the beach, bought more beer, drank that, and bought some more. This revelry went on for hours while appellant, trying to impress his friend Stroupe, showed him all around the beach, drinking beer all the while. Appellant had been bragging about River Street in Savannah, and Stroupe wanted to go there; about 5:00 p.m. appellant and his nephew and Stroupe rode to Savannah.

After further heavy drinking, Stroupe saw a package store, Dot's Liquorama, and announced that he wanted to stop and buy cold beer, inasmuch as the beer they had left in the car had gotten warm while they were at River Street. According to Stroupe, traffic prevented him from pulling into the liquor store's parking lot (the State suggested there was no such traffic problem). Stroupe then drove the car over to a ditch (canal), and both he and appellant got out of the car and went to the ditch to relieve themselves. Appellant felt queasy, evidently from so much drink, and he began to vomit. At this point, Stroupe announced, "I'll walk over here to the package store. Maybe I can get across the street by walking"; appellant said "Okay, I'll wait here," and Stroupe disappeared. Appellant testified he then went back to the car, to find that his nephew had flipped the passenger seat back. Evidently the nephew was still dozing and passed out, so instead of waking him up to get in the passenger seat, appellant opened the driver's door, flipped the bucket seat up and sat in the back seat next to his nephew, and waited for Stroupe to return.

Appellant was still drunk, queasy, about half sick. He does not know how much time elapsed before he heard "the most commotion[,] like moaning." He raised up out of the back seat and looked

over the passenger door down into the ditch, and saw Stroupe down in the ditch with blood all over him. According to appellant, he thought that Stroupe had been run over by a car. Appellant got out of the car on the driver's side, and picked Stroupe up out of the ditch and placed him in the passenger seat. One of Stroupe's fingers was gone and blood was squirting out of it. Appellant jumped in the driver's seat, started the car and drove off at a high rate of speed, spinning sideways out of the ditch. His only thought was to get to where people were and get help. He found traffic was backed up on President Street, and, spying a building that looked like it had fuel tanks and pumps around it where there might be a telephone, he turned off President Street, drove to the building and parked in the parking lot. There were two buildings; one was an open bay-door warehouse near the river.

Appellant testified he got out of the car and ran to the passenger side to see how badly Stroupe was hurt, but appellant could not see because there was too much blood. He testified he took a shirt from the car and ran down to the river, wet the shirt and went back to the car and wrapped the shirt around Stroupe's hand where the blood was squirting out. Then appellant ran to the little building to look for a phone or someone who worked there; he found no one. He did not know Stroupe had gotten out of the car. He was arrested, and saw Stroupe about 20 yards away lying on the ground, in custody.

Appellant testified unequivocally that he never saw a gun, had no idea Stroupe intended to rob the liquor store, and did not know Stroupe had been shot but thought he had been run over. Appellant testified also that he did not know Stroupe had run out of money; one of the State's photo exhibits shows bloody paper money in the Camaro seat although it was clear Stroupe had managed to get neither beer nor money before being shot by the storekeeper. Appellant testified further that he never knew anything about an armed robbery until the police arrested him at the warehouse, for "[t]o my understanding, [Stroupe] was going to walk over there and get a six-pack to go."

A motorist witness who saw Stroupe, bloody, stumbling across the street from the Liquorama, followed him to the Camaro at the ditch (canal). He first testified that from his own car 75 yards behind the Camaro, he saw appellant sitting in the driver's seat and then getting out quickly to help Stroupe into the car; but on cross-examination, he conceded he could not be sure whether appellant had been seated in the driver's seat or behind the driver's seat.

The storekeeper was the only person in the liquor store when Stroupe entered it. He testified that at about 5:55 p.m., a white male came in the store and when he reached the corner display case, a large caliber gun fell out of the man's pants (gym shorts). The man

"rather nonchalantly reached down" and picked it up, and said, "I just carry this." He then came around to the other end of the counter where the storekeeper was, and "at the time . . . he came to be in front of [the storekeeper], he was trying to put the gun back in his pants. . . . [T]hen he just turned around like as if he was leaving by the same route that he had entered, and when he got to the end of the counter, instead of turning to exit the store, he turned and came behind the counter . . . [and said], 'Why don't you go ahead and get your hands up?' and at the same time, he drew down on me." The storekeeper grabbed his own gun and shot Stroupe. The storekeeper thinks Stroupe fired a shot but could not be certain. Stroupe stumbled out the door and across the street and managed to get back to the Camaro at the ditch (canal).

The police arrived at Dot's Liquorama within a minute of the storekeeper's 911 call. One officer, on his way on President Street, passed a black Camaro, in which the driver, whom he identified at trial as the appellant, appeared to be trying to keep the car on the road while also looking at something in the front seat. This officer, Bashlor, went on to Dot's Liquorama, was directed out to the ditch (canal), and two persons there pointed west, indicating where the Camaro had gone. Another officer, Ennis, drove up at that moment and Bashlor pointed him to the west. After getting a more detailed description from the witnesses, Bashlor drove off and followed the other police cars to the Sayler Marine Warehouse where appellant had parked. This officer testified that the Camaro had stopped before the police had come upon it.

Corporal Ennis testified that when he arrived at the ditch (canal) where the Camaro had first been parked, he was pointed west by Officer Bashlor. Proceeding west on President Street, he determined (apparently by radio) that the suspect car "did not come up the hill"; evidently deducing the car had turned off, Ennis turned off onto MacIntosh Street. He testified, "By that time, Officer Sharpley said he had a white male running down by the river," which he knew was just north of Sayler Marine Warehouse. Ennis drove to the warehouse; when he arrived, Officer Sharpley "was running two white males into the building." Ennis went around the other side of the warehouse and caught the two men coming out.

Officer Sharpley, who was the first officer to arrive at the warehouse, testified that when he first drove up to the warehouse, he saw the appellant running "through the warehouse," but then when he drove around the warehouse, he saw the Camaro parked with appellant back in the Camaro, with two other suspects. Appellant and Stroupe then got out of the car and ran through the warehouse, and were captured coming out.

The appellant contends the evidence is abundant from which to

reasonably conclude that after entertaining Stroupe all day, appellant might reasonably have been so drunk by 5:00 p.m., was queasy and in between dozing and passing out, such as to have noticed little and known even less of what Stroupe intended.

Notwithstanding any ruling upon the particular facts of any other case, it is well settled that in an entirely circumstantial case, the question whether there is a reasonable hypothesis favorable to the accused is the jury's province. Questions as to reasonableness are generally to be decided by the jury which heard the evidence, and finds beyond a reasonable doubt that there is no reasonable hypothesis other than guilt. The appellate court will not disturb that finding, unless the verdict of guilty is insupportable as a matter of law. *Harris v. State*, 236 Ga. 242, 244-245 (223 SE2d 643); *Lewis v. State*, 149 Ga. App. 181, 182 (254 SE2d 142). The appellate courts have no yardstick by which to ordinarily determine what in a given case is a reasonable hypothesis, save the opinion of 12 jurors of rational mind. *Townsend v. State*, 127 Ga. App. 797, 799 (195 SE2d 474). Moreover, in every case the jury is the arbiter of credibility including as to the defendant's explanation, and the jury is the body which resolves conflicting evidence, and where the jury has done so, the appellate court cannot merely substitute its judgment for that of the jury. See *Glover v. State*, 237 Ga. 859, 860 (230 SE2d 293).

The jury in this case decided that appellant's explanation as to his involvement and participation in the events surrounding Stroupe's attempted robbery, produced no reasonable hypothesis other than guilt. This finding was made in the entirety of the circumstances, including the credibility of the defendant, which the jury was in the position to judge. *Townsend*, supra. The finding is not insupportable as a matter of law, nor is it outside the proven facts. We conclude the verdict meets the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560), being such that a reasonable trier of fact could rationally find proof of guilt beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis.

2. Appellant contends the trial court erred in refusing, despite request, to give a "two theories" charge, i.e., where the facts in evidence and all reasonable deductions therefrom present two theories, one of guilt and the other consistent with innocence, the justice and humanity of the law compel the acceptance of the theory which is consistent with innocence. See *Barnett v. State*, 153 Ga. App. 430 (265 SE2d 348).

This jury, however, was charged correctly as to the requirement in a circumstantial case that guilt be found not only beyond a reasonable doubt, but also to the exclusion of every other reasonable hypothesis. The jury was also charged as to "parties to a crime" and the finding of criminal intent. Having been so instructed, the jury re-

turned a verdict of guilty. It follows that the jury, clearly finding in the evidence no reasonable hypothesis other than guilt, could not and did not find a theory consistent with innocence. While the charge was authorized, we are compelled by reason to find the failure to give it, if error, was harmless beyond a reasonable doubt, as it is highly probable the failure to give it did not affect the verdict. See *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869).

3. Appellant has abandoned his third enumeration of error by failing to present it by argument or citation of authority in his original brief. Court of Appeals Rule 15 (c) (2); *Quick v. State*, 166 Ga. App. 492 (304 SE2d 916).

*Judgment affirmed. Banke, P. J., and Beasley, J., concur.*

DECIDED JUNE 1, 1988.

*Michael K. Gardner*, for appellant.

*Spencer Lawton, Jr., District Attorney, Suzanne P. Craig, Assistant District Attorney*, for appellee.